Thomas RYAN, D.V.M., et ux.,
Appellants,

v.

MORGAN SPEAR ASSOCIATES,
INC., Appellee.

No. 1092.

Court of Civil Appeals of Texas,
Corpus Christi.

Jan. 26, 1977.

Rehearing Denied Feb. 24, 1977.

John C. North, North, White & Blackmon, Corpus Christi, for appellants.

B. Mills Latham, Dyer, Redford, Burnett, Wray & Woolsey, Corpus Christi, for appellee.

## OPINION

BISSETT, Justice.

This is a suit for damages for breach of contract, and, in the alternative, for negligence in the performance of professional services. Thomas Ryan (Dr. Ryan) and wife, Beverly Jean Mitchell Ryan, were plaintiffs in the trial court and Morgan Spear Associates, Inc., an architectural corporation, was defendant therein. Following a jury trial, a take nothing judgment was rendered in favor of the defendant. The plaintiffs have appealed.

The plaintiffs, in their action for breach of contract, alleged that they entered into a written contract with the defendant for the preparation of plans and specifications for an animal hospital building which was to be built in Corpus Christi, Texas, and for the supervision of the construction of the building; that they were led to believe, and did believe, that the defendant had properly tested the soil upon which the building was

located and had adequately and properly designed and specified a foundation that would support the building; that immediately after completion, the building began to deteriorate, which was caused by an inadequate and improper design of the foundation; that the defendant breached its contract with the plaintiffs by reason of the faulty design of the foundation; that the building was a total loss; and that their damages amounted to $77,129.57.

In the alternative, the plaintiffs alleged that the defendant was negligent 1) in failing to "properly test the soil at the time and place in question", and 2) in failing "from what soil tests were made, to draw up proper plans and specifications under the attending circumstances and specifically, plans and specifications for a suitable foundation"; and that each such failure proximately caused the damages sustained by plaintiffs in the aforesaid sum of $77,129.57.

Special Issue No. 1 inquired:

"Do you find from a preponderance of the evidence that Morgan Spear Associates, Inc., was negligent in the performance of its professional services?"

To which, the jury answered: "no".

The jury was given the following instruction in connection with Special Issue No. 1, to-wit:

"In connection with the above Special Issue you are instructed that the word 'negligence' is defined as the failure to use ordinary care which is the use of that degree of care which architects of ordinary knowledge and skill, engaged in architectural practice in Corpus Christi and the general vicinity thereof would use under the same or similar circumstances."

Special Issue No. 2, the proximate cause issue which was conditionally submitted and was to be answered only if the jury answered "Yes" to Special Issue No. 1, was not answered by the jury.

The plaintiffs, in points 1 and 2 contend that the trial court erred in submitting Special Issues 1 and 2 because the suit is "for breach of contract and an implied warranty that defendant had a duty to prepare plans

and specifications for a building suitable for the purposes for which it was going to be used and the submission of 'negligence', which was not an issue, placed an undue burden on plaintiffs".

Dr. Ryan, a veterinarian, and the defendant, acting by and through Morgan Spear, its president and principal stockholder, entered into a written contract on or about February 15, 1971, which provided that the defendant would furnish the plaintiffs certain services in connection with the construction of the building here involved, as follows:

"The preparation of preliminary studies, working drawings, specifications, large scale and full size detail drawings, for architectural, structural, plumbing, heating, electrical, and other mechanical work; assistance in the drafting of forms of proposals and contracts; and the general supervision through construction of the project."

The defendant hired Wally Wilkerson, a structural engineer, to prepare the plans and specifications for the foundation of the building. Wilkerson did so. The building was built by Fred Gunther, dba Creative Constructors.

The building was completed in June, 1971, in accordance with the plans and specifications. In September, 1971, the building began to deteriorate; the concrete floor cracked in several places, the air conditioner ducts pushed out of the walls, the doors warped and the concrete block walls showed signs of separation. Thereafter, the building was inspected by Gunther, Wilkerson and Frank Hall, a member of the defendant architectural firm. Following the inspection, the defendant wrote a letter to the plaintiffs on November 12, 1971. They were advised:

"After inspection by our Structural Engineer, Mr. Wally Wilkerson, of your damage, we concluded the following:

1. Massive water migration under building on East side caused slab to heave upward in some areas, thus damaging partitions, cracking floor slabs and racking doors. The source of this

water is primarily roof drainage from the adjacent building on the property adjoining yours.

2. We recommend that you notify your neighbor, either personally or through your lawyer, that he must make provisions for keeping this water off your property . . . ."

3. We have instructed the General Contractor, Creative Constructors to provide peripheral drainage of the building, particularly the critical area on the East side where water traps . . . Mr. Gunther says he wished to auger some holes near the areas where the pressure seems most intense to see if it will relieve some of the pressure and introduce a drying action to the water over the slab.

4. We recommend that you make no effort to repair the damage until the slab stabilizes. We can expect the shifting to reverse in direction and openings to close to about one half current size if we are observing maximums."

Six months after Dr. Ryan received the letter, he had Robert White, a soil expert for Trinity Testing Lab, come to the building site and test the soil. White concluded from the laboratory tests which were made under his direction that the damage was caused by moisture influx into the highly expansive soil layers under the building. The building continued to deteriorate, although the extent of permanent damage in late 1971 was disputed.

■ It is a well settled rule that an architect must use the skill and care in the performance of his duties commensurate with the requirements of his profession, and he is liable in damages if he is negligent in performing such duties. It is stated in 6 C.J.S. Architects § 27:

"The architect, by his contract, implies his possession of ordinary good taste, skill and ability, and a promise to exercise them reasonably, without neglect, and with a certain exactness of performance, in seeing that the work is properly done. The degree of skill required is such as would produce, if followed, a building of the kind called for, without marked defects in character, strength or appearance.

In the absence of special agreement, an architect is not liable for faults in construction resulting from defects in the plans, as his undertaking does not imply or guarantee a perfect plan or a satisfactory result, it being considered enough that the architect himself is not the cause of any failure, and there is no implied promise that miscalculations may not occur. Thus, an architect is only liable for a failure to exercise reasonable care and skill."

The above rule has been followed by the appellate courts of this State. See *Capitol Hotel Co. v. Rittenberry,* 41 S.W.2d 697 (Tex.Civ.App.—Amarillo 1931, writ dism'd); *American Surety Co. of New York v. San Antonio Loan & Trust Co.,* 98 S.W. 387 (Tex.Civ.App.1906, modified by the Supreme Court in 104 S.W. 1061, 106 S.W. 876); *Pierson v. Tyndall,* 28 S.W. 232 (Tex. Civ.App.1894, no writ); 6 Tex.Jur.2d, Architects and Engineers, § 31.

■ Concerning the question of warranties, both express and implied, in a contract between an architect and the owner of a proposed building, the rule in Texas is clearly stated in 6 Tex.Jur.2d, Architects and Engineers, § 32, as follows:

"A warranty by an architect will not be implied unless there is the clearest reason for it, and the burden of showing such reason rests on the one seeking to establish the warranty. Thus, where there is no warranty, express or implied, that plans contain no defects that might cause the collapse of the building while it is in construction, no such warranty should be implied by the owner in favor of one who, with plans and specifications before him and ample time to consider them, obligates himself to carry the work to completion."

Although there is a contract between the parties in the present case, the cause of action for damages sustained by the plaintiffs is tortious in nature. *Capitol Hotel*

*Co. v. Rittenberry,* supra; *Pecos & N. T. Ry. Co. v. Amarillo St. Ry. Co.,* 171 S.W. 1103, 1105-06 (Tex.Civ.App.—Amarillo 1914, no writ). The contract between the plaintiffs and the defendant architectural corporation does not contain any special guarantees or warranties. There is no implied warranty on the part of the defendant to the plaintiffs that the plans and specifications for the foundation of the building were free from the alleged inherent defects. The contract is set out in general terms such that the only implication arising from the terms is that the architect will use reasonable care in preparation of the plans and supervision of the construction of the project.

■ Damages "due to breach of a written contract", as asserted by the plaintiffs, is not an issue in this case. Any liability on the part of the defendant for the damages sustained by the plaintiffs can only be sustained on proof that it was negligent and that such negligence proximately caused plaintiffs' damages. The trial court properly submitted the issue of liability in Special Issues Nos. 1 and 2. The instruction contained in Special Issue No. 1 correctly sets out the appropriate standard of care that is applicable to this case. Moreover, the jury, in its answer to Special Issue No. 3, found that the defendant did not fail to perform its professional services in a good and workmanlike manner". Points 1 and 2 are overruled.

■ In points 3 and 4, plaintiffs assert that it was reversible error to submit Special Issues Nos. 1 and 2 because: 1) the submission of the Issue, "if submitted at all, should have inquired as to whether defendant, its agents, servants or employees, were negligent" (No. 3); 2) the submission of the Issue "limited the jury's answer to the degree of care of architects without mentioning the degree of care of a structural engineer which amounted to an instruction by the court that if defendant was not negligent in hiring the structural engineer, defendant would not be liable, regardless of the structural plans and specifications prepared by such engineer" (No. 4).

The plaintiffs' contention that Special Issues 1 and 2 should have included defendant as well as its agents, servants or employees is, in effect, an assertion that the case should have been tried on an agency theory. The assertion, however, is not preserved for review by this Court. The plaintiffs argue that Wilkerson, the structural engineer, as agent for the defendant architectural firm, and acting within the scope of his authority, negligently prepared the structural plans for the building. Although the petition does not specifically allege that Wilkerson was the agent of the defendant, it does allege that the defendant was responsible for the act of preparing the plans in a negligent manner. The evidence is sufficient to raise a fact issue on the question of agency. Morgan Spear consulted with Wilkerson and hired him to prepare the structural plans for the entire building. However, the special issue of whether Wilkerson was the agent of the defendant architectural firm was not requested by the plaintiffs. See *American Nat. Ins. Co. v. Denke,* 128 Tex. 229, 95 S.W.2d 370, 373 (Tex.Comm'n App.1936, opinion adopted); *Parmlee v. Texas & New Orleans Railroad Company,* 381 S.W.2d 90, 93-4 (Tex.Civ. App.—Tyler 1964, writ ref'd n. r. e.).

■ Where an issue has not been requested in substantially correct form and the trial court makes no express finding on the point, the issue will be presumed to have been found in support of the judgment. *Blackburn v. Sanders,* 278 S.W.2d 924, 927 (Tex.Civ.App.—Amarillo 1955, writ ref'd n. r. e.). See *Wise v. Anderson,* 163 Tex. 608, 359 S.W.2d 876, 881 (Tex.Sup. 1962). Under the record here presented, it must be presumed that the trial court found that Wilkerson was a consultant or independent contractor and not an agent of the defendant firm. Points 3 and 4 are overruled.

The plaintiffs, in points 8 and 12, complain that there is no evidence to support the jury's answers to Special Issues Nos. 1 and 3, respectively. They assert, in points 9 and 13, that the evidence is factually insuf-

ficient to support the answers to those issues.

In disposing of the "no evidence" points, we follow the well established rule which requires us to consider only the evidence and inferences tending to support the jury's answers to Special Issues Nos. 1 and 3, and to disregard all evidence and inferences contrary thereto. *Garza v. Alviar,* 395 S.W.2d 821 (Tex.Sup.1965). The "factually insufficient evidence" points require us to review all of the evidence. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (Tex. Sup.1951).

There is evidence that the east portion of the building sustained more damage than the other portions thereof. There is also evidence that rainwater from the roof of a building owned by a third party, whose west wall was three feet east of the east wall of the plaintiffs' building, drained onto the east side of the land upon which the plaintiffs' building was situated. It can be inferred from the evidence that the drainage from the roof of the building owned by the plaintiffs' neighbor soaked into the narrow strip of land between the two buildings. It can also be inferred from the evidence that the invasion of the water from the roof of the building owned by the neighbor caused the problem that resulted in the damage to plaintiffs' building.

In addition to calling White, the soil and foundation expert for Trinity Testing Lab, as a witness, the plaintiffs also called Charles Bellah, an architect and engineer, as a witness. Both White and Bellah testified, in substance, that they would not recommend a foundation based solely upon field-tested core samples taken in the Corpus Christi area since the tests did not furnish sufficient information for adequate foundation specifications.

Bellah testified that the raft-type foundation used in this case, since the foundation slab is tied into the deeper set piers, was a faulty design which should have been apparent to an architect since it was the worst of possible designs. He further testified that the architect, as the "prime professional", should not accept on faith the structural engineer's recommendations; and that he (Bellah), instead of recommending a raft-type foundation, would have recommended a floating slab which would give when the moisture causes expansion of the soil.

The defendant's witnesses, in addition to Spear, Wilkerson and Gunther, were Jack Solka, an architect, and Harland Heitkamp, a civil engineer. Several theories were advanced by the defendant's witnesses as to the cause of the damage to the building. None attributed the damage to an inadequate or faulty design of the foundation. The principal theory was that such damage was the result of "massive water migration" on the east side of the building which had been mentioned by the defendant in its letter of November 12, 1971 to the plaintiffs.

Spear testified that his firm hired Wilkerson because of his good reputation in the field of structural engineering. According to Spear, the design plans and specifications of the foundation for the building were left up to the structural engineer. He said that he did not have any reason to suspect that the foundation so designed would prove to be inadequate. Wilkerson determined that the raft-type foundation should be used. He based his decision partly on data that he obtained from two core samples which he obtained from the plaintiffs' lot, and field-tested the cores at the site. The tests did not reveal the presence of the conditions found by White.

The peripheral drainage measures which the defendant in its letter of November 12, 1971, recommended that the plaintiffs take in order to correct the drainage problems caused by the adjoining building were never undertaken by the plaintiffs and were never accomplished by anyone. Spear and Gunther both testified that Gunther was willing to correct the problem with no cost to Dr. Ryan, but that he was prevented from doing so by conditions over which he did not have control. There is testimony that Gunther's employees made several attempts to put certain drainage facilities in on the east side of the plaintiffs' building,

but they were prevented from doing so because each time that they attempted to do the work, plaintiffs' adjoining neighbor objected and threatened them with a shotgun. No one, plaintiffs or anyone else, did anything to prevent the adjoining neighbor from acting in this manner.

Spear testified that he and Fred Gunther, before construction had commenced, informed Dr. Ryan that there was a potential water shedding problem in placing the building close to the neighbor's building, but that Dr. Ryan had insisted upon locating the east wall of his building at the place called for in the plans and specifications, which was approximately three feet from the west wall of his neighbor's building. Spear also testified that Dr. Ryan would not let Gunther effect the remedies suggested in the letter. This was disputed by Dr. Ryan.

Heitkamp testified that the damage was caused primarily by the capillary or pumping effect of putting a sealed moisture barrier over the ground water table which caused the ground water to rise to the expansive clay, which resulted in tremendous pressures on the foundation. He also testified that in late 1970 (when Wilkerson prepared the plans and specifications for the foundation) this effect would not have been predictable even with the information supplied in the lab tests conducted by White.

Solka testified that he was familiar with the raft-type foundation, and that his firm (an architectural firm) had used that type of foundation "a number of times in Corpus Christi". He was acquainted with the soil conditions in the area of Corpus Christi. He said that the soil conditions in the ground upon which at least three of the buildings designed by his firm where the raft-type foundation was used were built were similar to those underlying the plaintiffs' building. No trouble with the foundations of these buildings resulted. He stated that Wilkerson, defendant's structural engineer, prepared the plans and specifications for the foundations of the three buildings (a furniture store, a warehouse and a movie

theater), all of which were larger than plaintiffs' building. With respect to the function of testing soils in connection with the design of a foundation, he said:

"We rely on our structural engineers."

Wilkerson testified in response to hypothetical questions that under the conditions existing at and prior to the design of the foundation in question the ordinarily prudent architect could not have foreseen that the building would sustain damage as a result of a raft-type foundation. He further testified that a reasonably prudent architect would have been acting prudently in allowing the building to be built under the circumstances and in accordance with the plans and specifications which existed at the time that the building was designed and built. It was his opinion that the conditions which caused the damage to the building would have stabilized and the cost of repairs would have been between $7,000.00 and $10,000.00, had the recommendations contained in the November 12, 1971 letter been carried out.

Wilkerson, Solka and Heitkamp all testified that the raft-type foundation was not unusual for the type of soil which was present at the site of the building, and particularly so where cost was a factor. There is evidence that cost was a factor in this case. There is a dispute in the record as to whether Dr. Ryan was informed that the raft-type foundation was the least expensive of the three types of foundations that could have been designed.

It is conclusively established by the evidence that none of the plaintiffs' witnesses had any personal knowledge of the conditions as they existed at the time the plans and specifications for the foundation were prepared, or in September, 1971, when it first became evident that the building was deteriorating rather rapidly, or in November, 1971, when the defendant suggested corrective action. There is no evidence that the plaintiffs attempted to do anything towards correcting the conditions after they became known.

The testimony of a party to a suit raises an issue of fact. *Bishop v. Bish-*

*op,* 359 S.W.2d 869 (Tex.Sup.1962). The conflicts· and contradictions between the testimony of the parties hereto and that of their witnesses are extensive. There was evidence pro and con. The evidence was not consistent. It varied in each area with considerable degree. But, it is within the sole province of the trier of fact, who had the opportunity to observe the demeanor of the witnesses on the stand, to judge their credibility and the weight to be given their testimony, to resolve conflicts in the testimony of one witness with testimony of another witness, and to believe part of a witness' testimony and to disregard other portions of his testimony. *Hall v. Villarreal Development Corporation,* 517 S.W.2d 326 (Tex.Civ.App.—Corpus Christi, 1974, writ dism'd); *Royal v. Cameron,* 382 S.W.2d 335 (Tex.Civ.App.—Tyler 1964, writ ref'd, n. r. e.); *United States Fidelity & Guaranty Co. v. Carr,* 242 S.W.2d 224 (Tex.Civ.App.—San Antonio 1951, writ ref'd); *Ohlen v. Hagar,* 212 S.W.2d 253 (Tex.Civ.App.—Fort Worth 1948, writ ref'd, n. r. e.).

A Court of Civil Appeals cannot substitute its judgment for that of trier of fact, even though after reviewing the evidence it may have reached a different conclusion from that of the jury or the trial judge sitting without a jury. *Bardwell v. Anderson,* 325 S.W.2d 929 (Tex.Civ.App.—Houston 1959, writ ref'd n. r. e.); *Dyer v. Sterett,* 248 S.W.2d 234 (Tex.Civ.App.—San Antonio 1952, no writ). A Court of Civil Appeals may not pass upon the credibility of witnesses or substitute its findings for those made by the trial judge or jury, as the case may be. *Burchfield v. Tanner,* 142 Tex. 404, 178 S.W.2d 681 (1944).

The conflicts in the evidence in this case were resolved by the jury in favor of the defendant. We hold that there was ample evidence of probative value which supports the answers of the jury to Special Issues Nos. 1 and 3. Points 8, 9, 12 and 13 are overruled.

We have carefully considered all of the plaintiffs' remaining points of error. They are all overruled.

The judgment of the trial court is AFFIRMED.